UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| DOUGLAS ZOLLMAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) No. 4:24-cv-00071-SEB-KMB |
| MAGNOLIA HEALTH SYSTEMS XI, LLC, | ) ) ) |
| Defendant. | ) ) ) |
| MAGNOLIA HEALTH SYSTEMS XI, LLC, | ) ) |
| Counter Claimant, | ) ) |
| v. | ) ) |
| DOUGLAS ZOLLMAN, | ) ) |
| Counter Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Douglas Zollman ("Mr. Zollman") brought this employment discrimination action against his former employer, Defendant Magnolia Health Systems XI, LLC's ("Magnolia"), alleging that he was subjected to a hostile work environment and that he was constructively discharged because of his sexual orientation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* Now before the Court is Magnolia's Motion for Summary Judgment. Dkt. 31. As discussed in greater detail below, Magnolia's Motion for Summary Judgment is **DENIED**.

1

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the "put up or shut up" moment in a litigation, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact to accept [their] version of events" and to find in their favor on any disputed elements. *Steen v. Meyers*, 486 F.3d 1017, 1022 (7th Cir. 2007). Because summary judgment is not "a vehicle for resolving factual disputes," the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, those tasks belong to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

# BACKGROUND

Omitted from the following factual recitation are factual assertions that have no bearing on our determination of the legal claims before us as well as those that are unsupported by admissible record evidence.[1]

## I. The Parties

Magnolia is the licensed operator of Azalea Hills ("Azalea"), a residential care and assisted living facility located in Floyd Knobs, Indiana. On January 18, 2022, Magnolia hired Mr. Zollman, a gay man, as Azalea's Dietary Manager. Mr. Zollman's responsibilities as Dietary Manager are not described to us, since neither party has explained what those duties entailed beyond indicating that he oversaw ordering food for Azalea's residents. Alexander Decl. ¶ 10, dkt. 45-1 ("It was [Mr.] Zollman's responsibility to place food orders . . . ."). Mr. Zollman resigned from his position effective immediately on October 19, 2023. Prior to his resignation, Mr. Zollman received "a yearly raise" in his wages. Zollman Dep. 85:22–87:5, dkt. 33-2 at 32–34.

During Mr. Zollman's tenure as an at-will employee, Azalea's Administrator and Mr. Zollman's direct supervisor was Cassandra McCoun ("Ms. McCoun"). Mr. Zollman's allegations of discrimination relate primarily to his direct and indirect interactions with Ms. McCoun.

---

[1] For instance, we have excluded Mr. Zollman's assertions of fact supported only by reference to his unverified Complaint, *see* dkt. 45 at 5, 10, which comprises mere allegations and thus does not establish facts for purposes of summary judgment. *Jones v. Van Lanen*, 27 F.4th 1280, 1287 (7th Cir. 2022); *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *see* S.D. Ind. L.R. 56-1(f)(2).

## II. Azalea's Employee Handbook

While employed at Azalea, Mr. Zollman twice received a copy of the Employee Handbook (the "Handbook"): once on January 18, 2022, and again on May 25, 2022, following an April 2022 revision. Dkt. 33-2 at 38–39. We highlight below specific aspects of the Handbook to which the parties have cited.

### A. Equal Employment Opportunity & Anti-Harassment Policy

According to Azalea's equal employment opportunity and anti-harassment policy, Azalea is "committed to providing a workplace free of inappropriate treatment of any employee because of an employee's" legally protected characteristic(s). Dkt. 33-2 at 48. Continuing, the Handbook provides that Azalea "does not . . . condone or tolerate any harassing or otherwise inappropriate conduct based on any legally protected category" and "is committed to protecting employees from inappropriate conduct . . . ." *Id.* at 48–49.

To report behavior inconsistent with Azalea's anti-discrimination policies, employees "must immediately report [their] concern(s) to the Administrator or Director of Nursing." *Id.* at 50. Alternatively, if employees are uncomfortable reporting thereto, they may place a call to Azalea's hotline. *Id.* Thereafter, "[m]anagement will investigate and take appropriate action as to all complaints." *Id.*

### B. Resident Abuse

When employees are accused of "resident abuse" (a term which neither party defines), "[i]t's the policy to relieve them of their duties while an investigation is performed." McCoun Dep. 22:22–25, dkt. 45-4 at 11. The mandatory investigation entails "interviewing witnesses," namely staff members. *Id.* at 23:1–4, dkt. 45-4 at 12. Azalea must also report

allegations of resident abuse to the Indiana Department of Health. *Id.* at 23:5–11, dkt. 45-4 at 12.

### III.   Mr. Zollman's Treatment[2]

In opposing summary judgment, Mr. Zollman describes the following circumstances contributing to his belief that he was subjected to discrimination:

- On an unspecified date, as Mr. Zollman and a coworker were cleaning the dining room, a news broadcast aired on a nearby television regarding the latest monkey pox updates, including information about potential monkey pox contagion among people "in the gay community." Zollman Dep. 13:13–25, dkt. 45-3 at 8. Mr. Zollman's coworker reacted to the news, commenting, "Men with men, women with women, they're nothing but a bunch of animals." *Id.* When Mr. Zollman reported this comment to Ms. McCoun, she declined to take any remedial or punitive action, stating to Mr. Zollman that the coworker "can say what she wants" and that, due to the coworker being "an older lady," Ms. McCoun would not "say[ ] something to her." *Id.* at 95:4–9, dkt. 45-3 at 53.

- Alisha Collett, the business office administrator, informed Mr. Zollman that Ms. McCoun had questioned whether Mr. Zollman's marriage to his husband "was a real marriage" and had suggested "that she was looking to find another Christian individual, straight person to take [his] position." *Id.* at 32:14–20, dkt. 45-3 at 15; *see id.* at 93:17–22, dkt. 45-3 at 51.

---

[2] Magnolia has neither addressed nor rebutted any of the following allegations. *See* dkt. 50.

- Eric Torline ("Mr. Torline"), the corporate dietary manager, testified in his deposition that he overheard Ms. McCoun make negative comments about homosexuality, namely, that Ms. McCoun "doesn't understand how it's legal for two men to marry each other." Torline Dep. 22:5–16, dkt. 45-2 at 14. According to Mr. Torline, Ms. McCoun justified her remarks based on the fact that her son is gay. *Id.* at 22:19–23:2, dkt. 45-2 at 14–15.

- Mr. Torline also testified that Ms. McCoun questioned aloud "who is more of the man" in Mr. Zollman's marriage. *Id.* at 13:8–10, dkt. 45-2 at 8.

- In October 2023, as Mr. Zollman was attempting to fix a vacuum cleaner, Ms. McCoun approached him and asked, "Don't you live with a man? Do you not know how to fix stuff? . . . What are you, a little housewife?" Zollman Dep. 30:5–15, dkt. 45-3 at 13.

- When Ms. McCoun discovered that Mr. Zollman "had been interviewing at other places," she pressured him to quit his position at Azalea, stating that "if [he] didn't like it there[,] [he] could just quit." *Id.* at 77:2–7, 79:1–4, dkt. 45-3 at 41; *see, e.g.*, McCoun Dep. 18:12–14, dkt. 45-4 at 10; McCoun Aff. ¶ 5(h), dkt. 45-5.

- Mr. Zollman learned, directly and indirectly, that at least four other Azalea employees disapproved of his "lifestyle" (i.e., being gay), which Mr. Zollman did not report to Ms. McCoun because he knew that she, too, had questioned the legitimacy of his marriage. Zollman Dep. 88:13–95:9, dkt. 45-3 at 46–53. Although the parties provide no further details about these coworkers and/or the

6

nature of Mr. Zollman's interactions with them, Mr. Zollman's deposition testimony includes the identification of these coworkers as "Elizabeth Peterson," *id.* at 89:1, dkt. 45-3 at 47; "Emma," *id.* at 89:2, dkt. 45-3 at 47; "Beth Muniz," *id.* at 92:23, dkt. 45-3 at 50; and "Jacob Burr," *id.* at 93:24, dkt. 45-3 at 51.

- Jeffrey Alexander ("Mr. Alexander"), Azalea Hill's Activities Director from August 2022 through February 2023, stated in an affidavit that Ms. McCoun criticized the appearance of food prepared by Mr. Zollman, reportedly saying, "[T]hat is the way gay people cook." Alexander Decl. ¶ 6, dkt. 45-1. Ms. McCoun also reportedly stated that "gay people will go to hell." *Id.* ¶¶ 6, 8. According to Mr. Alexander, Ms. McCoun made these (and similar) comments in the presence of "[m]any staff members." *Id.* ¶ 6.

- According to Mr. Alexander, Ms. McCoun routinely referenced Mr. Zollman's sexual orientation to others, despite the fact that such information was "not well known." *Id.* ¶ 7.

During his deposition, Mr. Zollman testified that he was uncomfortable approaching Ms. McCoun to discuss issues relating to his sexual orientation because he had heard of her disparagements of him and/or his sexual orientation. Zollman Dep. 15:25–16:10, dkt. 45-3 at 10–11 (explaining that "because of things [Ms. McCoun] said . . . [he] didn't feel comfortable talking about those kinds of details with her"); *id.* at 30:20–31:16, dkt. 45-3 at 13–14 (stating that, although Ms. McCoun "never directly said[, ']I don't want you here because you're gay . . . ,['] she had . . . made comments to my peers and coworkers that" revealed "how she really felt about me"); *id.* at 76:7–21, dkt. 45-3 at 40 (felt uncomfortable

7

talking to Ms. McCoun because she openly disclosed her close friendship with the owner, indicating that "she had a lot of pull with the company").

Mr. Zollman did, nevertheless, report his "issues with [Ms. McCoun] treating [him] differently because of [his] sexual orientation" to Mr. Torline on approximately four occasions throughout 2023. *Id.* at 11:1–10; 33:25–40:13, dkt. 45-3 at 7, 16–23. Mr. Torline corroborated Mr. Zollman's testimony, stating that Mr. Zollman began reporting instances of Ms. McCoun's "[i]nappropriate comments" and "hostile demeanor" towards him within the first several weeks of Mr. Torline's employment in late 2022 through early 2023. Torline Dep. 12:16–14:21, dkt. 45-2 at 7–9. Mr. Zollman also testified that he phoned Azalea's hotline once prior to his resignation and again shortly thereafter. Zollman Dep. 79:20–81:25, dkt. 45-3 at 43–45. During one phone call, Mr. Zollman spoke to Human Resources Director Kirk Woodcock ("Mr. Woodcock"), who "more or less hung up" on him. *Id.*; *see also* Toomey Dep. 13:1–14:22, dkt. 45-6 at 7–8 (confirming call log entries showing that Mr. Zollman placed calls to the corporate line and stating that Mr. Woodcock was a person to whom somebody could submit a complaint of discrimination).

### IV. Mr. Zollman's Work Performance

Mr. Zollman maintains that he was a good employee and that his colleagues regarded him as such. Dkt. 45 at 8 (citing Torline Dep. 19:3–17, dkt. 45-2 at 11 (stating that he would be happy to work with Mr. Zollman again); dkt. 45-2 at 20 (text message from Mr. Torline to Mr. Zollman stating, "You're wonderful Doug."); *see, e.g.*, dkt. 45-4 at 29 (text message from co-worker Julie Bobby to Ms. McCoun stating, "I've never heard [Mr. Zollman] be abusive . . . ."). Likewise, Mr. Zollman has adduced evidence from his former

8

coworkers corroborating his assertion that Ms. McCoun had a "hostile demeanor" towards him, Torline Dep. 20:22–21:19, dkt. 45-2 at 12–13, and that Ms. McCoun "had it out for" him, Alexander Decl. ¶ 10, dkt. 45-1.

Throughout the course of his employment in 2023, however, Mr. Zollman received three write-ups based on alleged violations of Azalea's policies—the third and final of which was issued by Ms. McCoun on October 19, 2023, and included her recommendation for Mr. Zollman's termination. Unfortunately, neither party describes the nature of Mr. Zollman's alleged infractions; identifies who was involved; explains how the matters were resolved; or specifies *when* the underlying events and/or the subsequent write-ups occurred (except for the October 19th write-up). Because the Court is not required to "scour the record" and "make the lawyer's case," we do not expend our limited resources on assembling a cogent narrative of the record evidence where the parties have otherwise failed to do so. *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

Nevertheless, Mr. Zollman's summary judgment response does reveal that Mr. Zollman was written up on one occasion for denying a resident's request for a food item that was, at the time, out of stock. According to Mr. Zollman, he was disciplined for this incident, despite the fact that Ms. McCoun had specifically instructed him not to order more of the (unnamed) foot item, Zollman Dep. 59:14–22, dkt. 45-3 at 27; and despite the fact that "[i]t's not against policy to tell a resident [']no['] to a request for an item that's unavailable . . . ." McCoun Dep. 37:19–12, dkt. 45-4 at 20.

On another occasion, Mr. Zollman was allegedly reprimanded for disposing of a serving of fried eggs that a resident had requested be reheated. According to Mr. Zollman,

9

however, Azalea's policy is that, "[o]nce eggs . . . leave the kitchen, they can't be returned or reheated. They have to be thrown away and fresh ones have to be made." Zollman Dep. 63:20–22, dkt. 45-3 at 31.

"[S]ome of the write-ups" evidently concerned accusations of resident abuse. Dkt. 45 at 8 n.7. Although the factual bases for the alleged abuse remain undisclosed to us, the record reveals that no incident was reported to the Indiana Department of Health and that Mr. Zollman was not suspended from his position pending any subsequent investigation(s), despite Azalea's policy requirements. McCoun Dep. 26:1–5, dkt. 45-4 at 15.

## V. Mr. Zollman's Resignation

On October 19, 2023, Mr. Zollman submitted via text message to Ms. McCoun his notice of resignation. He testified at his deposition, "At the end of the day I felt like the hand was forced for me to [resign] because I believe [Ms. McCoun] was on the verge of getting rid of me . . . ." Zollman Dep. 77:19–22, dkt. 45-3 at 41. Indeed, Ms. McCoun confirmed that an employee who has received three write-ups, as Mr. Zollman had here, would be subject to involuntary termination under company policy. McCoun Dep. 39:18–22, dkt. 45-4 at 22; McCoun Aff. ¶ 5(b)(v), dkt. 45-5 ("Also on October 19, 2023, but prior to the time that Mr. Zollman's resignation text was received . . . , the involuntary termination of that employment had been 'recommended' by, through and within an 'Employee Warning . . . .' ").

## VI. Charge of Discrimination

On November 1, 2023, Mr. Zollman filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC), which charge he later amended on

10

February 6, 2024 (hereinafter, the "Charge"). In the Charge, Mr. Zollman alleged that similarly situated employees outside of his protected class were treated more favorably than he. During his deposition, Mr. Zollman named two similarly situated employees: Mr. Alexander, the Activities Director, and Amanda Happel ("Ms. Happel"), the "preceding" Activities Director. Zollman Dep. 49:18–20, dkt. 45-3 at 24. Although "Activities Director" and "Dietary Manager" are distinct positions, both are managerial-level jobs whose occupants report to the same supervisor (here, Ms. McCoun) and share overlapping responsibilities. *See id.* at 50:17–20, dkt. 45-3 at 25 ("The activity director was supposed to help the dietary manager clear the dining room . . . ."); McCoun Dep. 15:7–13, dkt. 45-4 at 7 (describing activities director duties as "helping in dietary" by "serv[ing] drinks, pass[ing] desserts, [and] clean[ing] up if needed"). On May 14, 2024, the EEOC dismissed Mr. Zollman's Charge and issued notice of his right to sue.

### VII. Procedural History

On May 29, 2024, Mr. Zollman filed the instant lawsuit, alleging that he was constructively discharged and subjected to a hostile work environment due to his sexual orientation, in violation of Title VII. Dkt. 1. Defendant has filed a counterclaim against Mr. Zollman, alleging that his claims are "frivolous and/or made in bad faith" and seeking an award for attorney's fees and costs expended in defense against his allegations. Dkt. 14. On November 12, 2024, we granted Mr. Zollman's request to dismiss the counterclaim without prejudice, explaining: "If Magnolia defeats Mr. Zollman's affirmative claims on the merits, it will qualify as the prevailing party and will at that point have an opportunity to argue

that an award of attorney's fees in its favor is warranted. A counterclaim to that effect is unnecessary to preserve the claim." Dkt. 28 at 3.

On January 28, 2025, Magnolia moved for summary judgment on Mr. Zollman's constructive discharge and hostile work environment claims, dkt. 31, and reasserted that Mr. Zollman's claims are factually and legally baseless and that Mr. Zollman should be "estopped from pursuit of his claims" due to his alleged "bad faith," dkt. 32 at 22–23. Mr. Zollman responded in opposition to summary judgment on April 30, 2025, dkt. 45, and Magnolia submitted a two-page reply on May 8, 2025, urging that Mr. Zollman "completely, entirely, and utterly fails to create any 'genuine issue of material fact,' " thereby entitling Magnolia to judgment as a matter of law, dkt. 50 at 1. Magnolia's Motion for Summary Judgment is thus fully briefed and ripe for ruling.

## DISCUSSION

Magnolia seeks summary judgment on Mr. Zollman's hostile work environment and constructive discharge claims. Additionally, Magnolia asserts that Mr. Zollman brought this action in bad faith and should be "estopped" from pursuing his claims further. A careful review of the arguments laid out in the briefs discloses that the instant motion fails to identify the undisputed and material facts and to address the pertinent legal principles establishing an entitlement to judgment as a matter of law. As explicated in greater detail below, Magnolia holds fast to its position that no unlawful discrimination occurred but omits any meaningful engagement with the disputed and undisputed material facts. Where, as here, the summary judgment motion is "blind to outstanding disputes of fact, or off-base on the relevant principles," sufficient "grounds [exist] for denying the motion." *Hotel 71 Mezz*

12

*Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). Because Magnolia's motion for summary judgment cannot be granted on the record before us, it shall be denied accordingly.

**I.     Hostile Work Environment**

To prevail on a hostile work environment claim, a plaintiff must establish that (1) he was subject to unwelcome harassment; (2) the harassment was based on a protected category; (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is basis for employer liability. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). "We consider the hostile work environment claim under a 'totality of the circumstances' approach." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citations omitted).

Magnolia challenges only the third element of Mr. Zollman's hostile work environment claim. "In determining whether conduct is severe or pervasive enough to alter the conditions of employment, courts must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson*, 894 F.3d at 828. "While a 'hellish' workplace is surely actionable, plaintiffs' evidence need not show a descent into the Inferno." *Gates v. Bd. of the City of Chicago*, 916 F.3d 631, 637 (7th Cir. 2019). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally question of fact for the jury." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018). "In order to remove such a question of fact from the jury on summary judgment, the court would have to determine that no

13

reasonable jury could find the conduct at issue severe or pervasive." *Id.* "If a reasonable jury could find that the conduct was severe *or* pervasive, then the claim must go to trial." *Robinson*, 894 F.3d at 828 (emphasis added). The standard for proving "severe or pervasive" conduct "may be met by a single extremely serious act of harassment or by a series of less severe acts." *Id.* (citations omitted).

    Viewing the record as a whole and in the light most favorable to Mr. Zollman, the non-movant, we conclude that a reasonable jury could determine that the alleged conduct at issue here was sufficiently pervasive to support Mr. Zollman's hostile work environment claim. Indeed, the record reveals a series of ongoing comments by Ms. McCoun, Mr. Zollman's direct supervisor, indicating that she not only harbored hostility towards him because of his sexual orientation but also openly expressed her disapproval to Mr. Zollman and his peers. *See, e.g.*, Torline Dep. 20:22–21:19, dkt. 45-2 at 12–13; Alexander Decl. ¶ 10, dkt. 45-1. Although Ms. McCoun's reported statements—i.e., questioning the legitimacy of Mr. Zollman's marriage, Zollman Dep. 32:14–20, dkt. 45-3 at 15; *see id.* at 93:17–22, dkt. 45-3 at 51, indicating that "gay people will go to hell," Alexander Decl. ¶¶ 6, 8, dkt. 45-1, and the like—may not, standing alone, support an actionable claim, *see Johnson*, 892 F.3d at 900, Mr. Zollman's claims are reinforced by his contention that Ms. McCoun fostered a hostile work environment when she sought to replace him with "another Christian individual [and/or] straight person," Zollman Dep. 32:1–20, dkt. 45-3 at 15; *see id.* at 93:17–22, dkt. 45-3 at 51; directly pressured him to quit, *id.* at 77:2–7, 79:1–4, dkt. 45-3 at 41, 43; McCoun Dep. 18:12–14, dkt. 45-4 at 10; McCoun Aff. ¶ 5(h), dkt. 45-5; and interfered with his ability to perform his work duties by "go[ing] behind his back and plac[ing]

14

different [food] orders." Alexander Decl. ¶ 10, dkt. 45-1. Furthermore, Mr. Zollman has adduced evidence from which a reasonable jury could conclude that Ms. McCoun targeted him with baseless and manufactured write-ups, including accusations of resident abuse, which Ms. McCoun confirms in her deposition testimony were neither investigated nor reported to the appropriate state agency, as Azalea's policies require. McCoun Dep. 22:22–23:11, 26:1–5, dkt. 45-4 at 11–12, 15. Viewed in its entirety, this record—which Magnolia leaves entirely unrefuted—could permit a reasonable jury to conclude that Ms. McCoun was motivated by discriminatory animus towards Mr. Zollman based on his sexual orientation and undertook efforts to interfere with Mr. Zollman's work performance, thereby supporting liability for having created a hostile work environment.

　　Magnolia's sole argument in favor of summary judgment is that Mr. Zollman's evidentiary basis for his claims falls short of satisfying his burden to prove that he experienced "severe" harassment during his tenure at Azalea because the alleged discriminatory conduct was neither physically threatening nor humiliating. Dkt. 32 at 20–21. According to Magnolia, "verbal statements . . . , which were offensive" to Mr. Zollman, are "immaterial for all purposes of this [summary judgment] motion." *Id.* at 18–19. This analysis is lacking as entirely unpersuasive and out of sync with controlling legal precedent.

　　Clearly, as Magnolia contends, Mr. Zollman has cited no evidence establishing that he was physically threatened or humiliated. However, the absence of such evidence is not conclusively dispositive, nor does it undermine the other evidence, detailed above, on the basis of which a reasonable jury could find that Mr. Zollman was nonetheless subjected to a hostile work environment because of his sexual orientation. Magnolia's unfortunate

15

failure to fully address the entire factual record before us and its failure to explain how the law, as applied to the facts before us, forecloses Mr. Zollman's theory of recovery dooms its motion. "[I]t is not this court's responsibility to research and construct the parties' arguments." *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011). Magnolia has failed to establish its entitlement to judgment as a matter of law on Mr. Zollman's hostile work environment claim, and its summary judgment motion must accordingly be denied.

## II.     Constructive Discharge

To establish constructive discharge, a plaintiff generally "must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002). There are "two different forms of constructive discharge." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). "In the first form, an employee resigns due to alleged discriminatory harassment" and must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress . . . ." *Id.* (internal citations omitted). "The second form of constructive discharge . . . occurs when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (citation modified). Either method of proof requires a showing "that the work environment had become intolerable." *Id.* (citation modified).

Here, too, Magnolia fails to address the entirety of relevant facts and legal principles, arguing only that Mr. Zollman cannot prevail under the former theory of constructive discharge and completely neglecting to engage Mr. Zollman's argument under the latter

16

form of constructive discharge. Based on the uncontroverted fact that Mr. Zollman resigned effective immediately on October 19, 2023—the same day that Ms. McCoun authored the third, and likely final, write-up on him, *see* McCoun Dep. 39:3–22, dkt. 45-4 at 22—Mr. Zollman maintains that "the handwriting was on the wall" and that he resigned "just ahead of the fall of the axe." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998). Because a reasonable jury could conclude that Mr. Zollman would have been fired had he not resigned—and Magnolia does not argue otherwise—Magnolia is not entitled to judgment as a matter of law. Its motion for summary judgment shall therefore be denied as to Mr. Zollman's constructive discharge claim.

### III.   Judicial Estoppel

Magnolia asserts that Mr. Zollman has acted in bad faith because, in the Charge of Discrimination, he alleged "under penalty of perjury" that Azalea treated "similarly situated employees" outside his protected class more favorably than he, despite Mr. Zollman's apparent knowledge that, "in actual fact, there were no similarly situated employees." Dkt. 32 at 22–23 (citation modified). According to Magnolia, the Court "should correctly [sic] not countenance th[is] bad-faith conduct and correctly [sic] should protect [our] own integrity by concluding that Mr. Zollman is estopped from pursuit of his claims asserted in this civil action." *Id.* at 23 (citation modified).

The doctrine of judicial estoppel "protects the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (citation modified). Similarly, "federal courts have the inherit power to impose a wide range of sanctions upon

17

parties for abusive litigation," meaning "cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders." *Id.* at 799 (citation modified).

Regarding the case at bar, it escapes us how Mr. Zollman's allegations concerning the existence of similarly situated employees—i.e., a salient, essential, and fact-dependent element of an employment discrimination claim—exemplifies bad faith, much less how the circumstances here merit an exercise of our estoppel authority. Because Magnolia's contentions bear no discernable basis either in fact or law, we shall deny its request.

## CONCLUSION

For the reasons stated above, Magnolia's Motion for Summary Judgment is hereby **DENIED**. Dkt. 31. This matter shall proceed accordingly.

IT IS SO ORDERED.

Date: 9/10/2025

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Elizabeth Gatten
Biesecker Dutkanych & Macer LLC
egatten@bdlegal.com

Richard Bernard Kaufman
Richard B. Kaufman Attorney-at-Law
rich@rkaufmanlegal.com